**B–E–C–K CONSTRUCTORS, a joint venture, consisting of Cummins-Egge, Inc., and Koon-Boen, Inc., Frank White, d/b/a W & S Construction Company**

v.

**The UNITED STATES.**

**No. 391–72.**

United States Court of Claims.

Feb. 22, 1978.

---

sion of Trial Judge Kenneth R. Harkins, filed July 7, 1977, pursuant to Rule 134(h), having been submitted on the briefs and oral argument of counsel. Upon consideration thereof, since the court agrees with the trial judge's recommended decision, as hereinafter set forth,* it hereby affirms and adopts the said decision as the basis for its judgment in this case. It is, therefore, concluded that plaintiff is not entitled to recover on its petition and that defendant is entitled to recover $1,849.50 on its counterclaim. Accordingly, judgment is entered for defendant on its counterclaim against plaintiff in the sum of $1,849.50 and plaintiff's petition is dismissed.

## OPINION OF TRIAL JUDGE

HARKINS, Trial Judge:

█ In connection with the Atomic Energy Commission (AEC) program for underground nuclear tests on Amchitka Island, Alaska, B–E–C–K Constructors was awarded a prime contract by the Alaska District of the Army Corps of Engineers for work to resurface and seal an airport runway (Baker runway) on the island.[1] The work, originally priced at $782,405, and subsequently increased to approximately $900,000, required about 3 months, and was substantially finished, to the complete satisfaction of defendant, on August 10, 1969.

The contract[2] provided for defendant to "furnish barge transportation for equipment and material between Seattle, Washington and Amchitka, Alaska." Defendant, however, did not provide barge transportation to remove some of plaintiff's equipment until December 16, 1969, nearly 4

Lyle L. Iversen, Seattle, Wash., attorney of record, for plaintiffs; Lycette, Diamond & Sylvester, Seattle, Wash., of counsel.

Ray Goddard, Washington, D. C., with whom was Asst. Atty. Gen. Barbara Allen Babcock, Washington, D. C., for defendant.

Before COWEN, Senior Judge, and NICHOLS and BENNETT, Judges.

## OPINION

PER CURIAM:

This case comes before the court on plaintiff's exceptions to the recommended deci-

* Whereas the court adopts the trial judge's separate findings of fact, which are set forth in his report filed July 7, 1977, they are not printed herein since such facts as are necessary to the decision are contained in his opinion.

1. The style of this case designates Frank White, d/b/a W & S Construction Company, as plaintiff. Frank White is an independent contractor to B–E–C–K Constructors under the Amchitka Baker runway contract and is not in contractual privity with defendant. The subcontract did not contain an exculpatory provision that re-

lieved the prime contractor of liability, and B–E–C–K Constructors may maintain this action for damages to its subcontractor. The doctrine of *Severin v. United States,* 99 Ct.Cl. 435 (1943), *cert. denied,* 322 U.S. 733, 64 S.Ct. 1045, 88 L.Ed. 1567 (1944), *does not apply. Blount Bros. Constr. Co. v. United States,* 172 Ct.Cl. 1, 348 F.2d 471 (1965); *Seger v. United States,* 469 F.2d 292, 199 Ct.Cl. 766 (1972).

2. DACA85–69–C–0063 (contract 0063), dated April 16, 1969.

months after plaintiff had notified the Corps of Engineers (COE) that the equipment was ready to be removed. Plaintiff now seeks damages for breach of contract for the delay in return of its and its subcontractor's equipment.[3] For the reasons that follow, defendant satisfied its contractual obligations to return plaintiff's equipment and is not liable for any damage incurred by plaintiff.[4]

The Atomic Energy Commission in 1969 and 1971 conducted on Amchitka a series of full-scale underground tests of nuclear warheads for the Spartan missile. Baker runway, built during World War II, required resurfacing and sealing to be usable for movement of personnel and equipment for these tests. The test program was a large project that involved approximately 100 contractors and subcontractors, and the cost of preparation of the island amounted to approximately $285 million.

The contractual structure was complex. The AEC directly administered the principal drilling and mining contracts. The COE was utilized by the AEC in a supporting role for rehabilitation of the runway and for other earthwork. Holmes & Narver, Inc. (H & N) held an architect-engineering management contract from the AEC and was responsible for logistical support and surface construction for the test program. H & N had the responsibility for movement of all personnel and equipment to the island and, for this purpose, subcontracted with the Foss Launch & Tug Company (Foss) for all barge transportation.

The AEC principal office was located in Las Vegas, Nevada. H & N maintained offices in Las Vegas, Seattle, and on Amchitka. Plaintiff was located in Seattle, Washington, and Frank White, as field superintendent on Amchitka, managed the Baker runway contract work. The COE area engineer, who was the contracting officer's representative for contract 0063, was located in Anchorage, Alaska. Plaintiff's problems in the removal of its equipment from Amchitka, to a large extent, were due to difficulty of communications between these various, widely separated, offices.

In addition to the Baker runway project, B–E–C–K Constructors participated in the Amchitka test program in another joint venture known as B–E–C–K C–R–K & Associates, an association composed of Christenson, Raber-Kief & Associates. B–E–C–K C–R–K & Associates, as a joint venture, had a management and operation subcontract from H & N, part of which involved provision of stevedoring services to load Foss barges.

In the Amchitka test project, defendant agreed to supply surface transportation for equipment and material to and from the island. Contract 0063 provided that defendant would furnish barge transportation for equipment and material "between Seattle, Washington and Amchitka, Alaska," and would be responsible "for docking fees, loading and unloading at Amchitka Island, Alaska and Seattle, Washington." Transportation was required to "be scheduled with and approved by the Contracting Officer." Loading for plant and equipment was to "be scheduled 30 days prior to shipment" except that on initial mobilization loading

---

3. Contract 0063 is on Standard Form 23 and contains the standard articles for changes, disputes, and suspension of work, and a special provision in which defendant, through the COE, obligated itself to furnish barge transportation and related loading/unloading costs, between Seattle, Washington and Amchitka, Alaska. Defendant's delay in removal of plaintiff's equipment from Amchitka may have been amenable to administrative disposition through disputes clause procedures as a constructive suspension of work. The ASBCA declined jurisdiction of plaintiff's claim and both parties have proceeded in this court on breach of contract concepts. The administrative remedy provided by the contract is not jurisdictional and is a procedural right that may be waived by the parties. *Nager Elec. Co. v. United States,* 396 F.2d 977, 982–83, 184 Ct.Cl. 390, 401 (1968); *George Bennett Constr. Co. v. United States,* 178 Ct.Cl. 61, 71, 371 F.2d 859, 864 (1967). In September 1975, a 4-day trial was conducted in Seattle, Washington, by former Trial Judge Charlotte P. Murphy.

4. The findings of fact detail the course of conduct that is the basis for plaintiff's claim. The opinion summarizes only the facts necessary to provide a context for the decision.

would be "initiated on 10 day notification." On the return trip from Amchitka Island to Seattle, Washington, transportation would "be on a space available basis."

There are no provisions in the contract that specifically would allow for diversions to other ports on trips between Seattle and Amchitka, or which would provide a procedure for such arrangements. Nor were there provisions that would fix the responsibility for the costs of any such diversions. Plaintiff's claim requires contract 0063 to be interpreted as though it included a provision to the effect that diversions to ports en route between Seattle and Amchitka would be permitted on plaintiff's request when plaintiff made its own arrangements for, and paid for, such diversions with the barge operator. No amendment for this purpose was ever requested or made, however, and such interpretation must find its basis in an implication from the facts and the conduct of the various parties that were involved on behalf of the defendant.

Defendant contends that the contract only requires the Government to return plaintiff's equipment to Seattle, Washington, on a "space available" basis after 30 days' notice. Any diversion to other ports was solely for the benefit of plaintiff and would be an accommodation wholly apart from and distinct from the contract provisions.[5] This contention disregards the extensive course of dealings that exist in contract 0063 and generally in COE contracts for Alaskan operations. In the factual circumstances of this case, however, taking into account the practice to allow off-course diversions, defendant's removal of plaintiff's equipment designated for diversion to Adak and Seward was a reasonable compliance with the contractual arrangements.

The route from Seattle to Amchitka, on a geographical basis, bypasses the ports of Adak and Seward, located along the Aleutian crescent. It is not substantially out of the way for a barge going between Seattle and Amchitka to go off course to call at either Seward or Adak. Plaintiff was an experienced Alaskan contractor and, in previous dealings with the COE, diversions were arranged informally in the normal course of operations for the convenience of the parties. When satisfactory arrangements were made for the contractor to pay any additional costs, the COE had no objection to the contractor dealing directly with the tug company for off-course diversions.

When plaintiff mobilized for the Baker runway project, its equipment came from three locations—Seattle, Seward, and Adak. By correspondence, and at a preconstruction and safety conference on May 7, 1969, plaintiff and the COE made arrangements for an off-course diversion into Seward. As provided in contract 0063, plaintiff's Seattle-based equipment was loaded and departed Seattle, Washington, on Foss barge 210 on May 14, 1969; the barge, pursuant to written arrangements with the COE, was sent off course to pick up plaintiff's equipment at Seward. The equipment that originated at Adak moved to Amchitka on a barge provided by plaintiff at no cost to defendant.

The correspondence related to the off-course diversion into Seward shows that the COE agreed with plaintiff that the procedure was part of normal operations under the contract. It is not clearly established in the record, however, that the correspondence and discussions relative to the inbound transportation to Amchitka were intended to apply also to return arrangements after completion of the project. Contract 0063 itself distinguishes arrangements in mobilization from those in demobilization, and provides special notice requirements in the initial mobilization phase, presumably in the interest of timeliness in the test program.

Plaintiff's April 25, 1969, request for barge transportation sought permission to send the barge off course to load equipment at Seward and provided for arrangements to be made to have dock space available for an inspection of the equipment. The COE's

---

5. Defendant cites *Vogt Bros. Mfg. Co. v. United States,* 160 Ct.Cl. 687, 702 (1963); *Tri–Cor, Inc.* *v. United States,* 458 F.2d 112, 198 Ct.Cl. 187 (1972).

May 5, 1969, reply stated "this office has no objection to the diversion of the government barge to Seward, Alaska provided there are no additional costs to the government." The letter also provided that "[a]rrangements for payment of these costs will be made by you directly with Foss Barge Company in Seattle, Washington."

■ By August 10, 1969, work on contract 0063 was substantially completed. In the retrograde (demobilization) phase, there is no exchange of correspondence, or record of conferences between the COE and plain-. tiff, that would supply a contractual basis comparable to the exchange of correspondence that was made in the mobilization phase. The arrangements in demobilization were made through verbal communications and other informal arrangements and there is no direct exchange of correspondence between plaintiff and the COE. Instead, there are numerous written "actions" among defendant's representatives with copies to each other and to plaintiff. These communications cast substantial doubt on such questions as whether plaintiff had requested special treatment for return of Seattle-bound equipment and whether the AEC Amchitka representative expected further communications from plaintiff to H & N relative to arrangements for the requested diversions. These ambiguities could have been avoided, and plaintiff should have taken steps to clarify the special arrangements it sought. In the absence of any effort to clarify the contract by formal amendment, or at least by correspondence with the COE, plaintiff may not be relieved of its responsibility for the ambiguous situation that resulted.

Plaintiff notified the COE contracting officer's representative in Anchorage, by telephone, on August 10, 1969, that the equipment was ready to be removed and requested that it be removed as soon as possible. The contracting officer's representative, on the basis of plaintiff's verbal request, notified H & N by telephone that plaintiff's equipment was ready to be removed.

Plaintiff's verbal request for a loading date was confirmed in writing by letters to Anchorage, sent from Seattle on August 13 and from Amchitka on August 14, 1969. When these letters were sent, plaintiff believed that the August barge would depart Amchitka on August 18, and plaintiff requested shipment on that barge. The barge, however, departed Amchitka on August 13, before either of plaintiff's letters was delivered to the COE representative at Anchorage.

Both the August 13, 1969, request from plaintiff's project administrator in Seattle and the August 14, 1969, request from plaintiff's field superintendent on Amchitka listed particular pieces of equipment designated for three destinations: (1) equipment to be scheduled off course for Adak; (2) equipment to be scheduled off course for Seward; and (3) equipment to be returned to Seattle. By letter dated August 18, 1969, the COE representative formally requested H & N in Seattle to allocate space on the first available barge to depart Amchitka. This letter noted that plaintiff had requested off-course scheduling for Adak and Seward, and the COE representative requested "your earliest consideration be given for the movement of the Seattle-destined equipment due to future commitments by B–E–C–K Constructors in the Seattle area."

Plaintiff's Amchitka field superintendent's August 14, 1969, letter was transmitted to the AEC site engineer on August 15, who, in turn, forwarded it to H & N's Amchitka representative on August 16 with a memorandum that stated "[a]dditional information, re Contractor vs Government responsibility including insurance to follow." On August 27, 1969, the AEC Amchitka representative requested the H & N's Amchitka representative to comply with the August 18, 1969, request of the COE Anchorage area engineer. The AEC memorandum stated that equipment going to Adak and Seward "will be responsibility of contractor for all additional costs incurred in lieu of returning to Seattle."

Contract 0063, by its terms, specifically obligated defendant to transport plaintiff's equipment from Seattle to Amchitka and to

return the equipment to Seattle on a space available basis after 30 days' notice. The amount of time defendant is allowed to discharge its obligation to return plaintiff's equipment is not specified. It is well settled that where a time is not fixed in a contract for performance of an obligation, performance within a reasonable time, dependent upon the circumstances applicable, is required. Where no time limit is given, it is presumed that performance will be concluded within a reasonable time.[6]

All of plaintiff's equipment designated for return to Seattle in its August 13, 1969, request for a loading date was loaded on the September 13, 1969, barge and arrived in Seattle about September 29, 1969. The equipment that was designated off course to Adak was loaded on December 9, 1969, and delivered in Adak on December 10–11, 1969. Plaintiff's Seward-designated equipment was loaded on December 16, 1969, and, at plaintiff's direction, was delivered off course to Seward or returned to Seattle. This delivery schedule, in the circumstances, was reasonable and accords with defendant's contractual obligations.

After plaintiff's equipment was ready to be demobilized on August 10, 1969, five barges were available to be used: August 13, August 27, September 13, November 23, and December 9 or 16, 1969. Defendant elected to use the September barge for plaintiff's Seattle equipment and the December barge for the remainder.

■ Contrary to plaintiff's expectations, the August barge departed Amchitka on August 13, 1969, prior to receipt of a formal request for space. At the time the barge departed, the COE representative had given H & N's personnel verbal notice that plaintiff's equipment was ready, but had not authorized the equipment to be loaded. In a project as complicated as the Amchitka tests, with multiple Government agencies involved, it is unreasonable to assume that informal verbal requests, such as would be permissible in less complex projects that involved only the COE Anchorage area engineer, could be implemented on 2 days' verbal notice. The contract, by its terms, provided for 30 days' notice. Defendant's failure to load plaintiff's equipment on the barge that departed August 13 is reasonable and cannot be the basis for breach of contract.

■ On August 24, a Foss barge, chartered by Christenson, Raber-Kief & Associates, Inc., for a trip from Adak to Shemya and return, was passing Amchitka and would either return to Adak or to Seattle. C–R–K's charter terminated when the barge returned to Adak or was abeam of Adak, en route to Seattle. Plaintiff notified the COE Anchorage representative and personnel of the other agencies on Amchitka that this barge could be made available if the Government would bear the cost of loading and lashing at Amchitka. No additional transportation costs were discussed. Defendant, however, did not accept plaintiff's offer. H & N had a contract with Foss to provide all of the barge transportation needed for the Amchitka project, and, at that time, additional barge space was not needed for project transportation requirements. Moreover, the charter rate for the C–R–K barge was greater than the charter rate H & N had arranged with Foss. Defendant had no obligation in August to make special efforts outside its normal routines to return plaintiff's equipment. It was not necessary, in August, to provide space in addition to the next barge regularly scheduled for September. The COE representative told plaintiff the C–R–K barge was declined because another barge would be available in early September, and that then there would be space available for all of plaintiff's equipment because very little material would be leaving Amchitka before the October test.

If plaintiff had an extraordinary need to return the Adak equipment in August, in view of its relationship to C–R–K & Associ-

---

**6.** *Societe Anonyme Des Ateliers Brillie Freres v. United States,* 160 Ct.Cl. 192, 201 (1963); 17 Am.Jur.2d *Contracts* §§ 329–30 (1964).

ates, it would have ordered the C–R–K barge into Amchitka at its own expense. This was the procedure by which the equipment originally was brought to Amchitka from Adak. In such event, a contract adjustment could have been the subject of negotiations with the COE to give effect to the transportation provisions of the contract.

The September barge departed Amchitka on September 13, 1969, loaded only with the equipment of plaintiff and of other contractors that was designated for return to Seattle. There was ample space available to carry all of plaintiff's equipment, including the equipment designated for off course to Adak and Seward, in addition to the equipment of other contractors that was being returned to Seattle. The AEC Las Vegas office directed H & N to stop loading at the end of free demurrage time after all Seattle-destined cargo was on board. Plaintiff's Adak- and Seward-designated equipment was not loaded, by direction of the AEC, because plaintiff had not provided formal written arrangements to AEC, to H & N, or to COE to cover payment for the diversions. There was no priority cargo on the September 13 barge, and no operational reason precluded the barge from carrying, in addition to the Seattle equipment, plaintiff's Adak-bound and Seward-bound equipment. The barge departed at the conclusion of its 96 hours of free demurrage allowed by H & N's contract with Foss. If the September barge had remained in Amchitka long enough to load all of plaintiff's equipment, it would have accrued demurrage for 1 or 2 days at the rate of approximately $2,000 per day.

Plaintiff's claim turns on the contractual significance of AEC's decision not to have H & N load plaintiff's Adak- and Seward-destined equipment on the September 13, 1969, barge. The AEC decision not to load was the result of confusion in communications between plaintiff's and defendant's representatives. Plaintiff's request for off-course diversions was a departure from literal provisions of the contract and plaintiff's imprecise method of operations generated the confusion that arose. Plaintiff knew, or should have known, in the factual situation that existed after the August 18 letter of the COE and the August 27 memorandum of AEC, Amchitka, to H & N, Amchitka, that additional specific information should be provided to AEC and to H & N before the September 13, 1969, barge was loaded. In the absence of written arrangements between plaintiff and the COE for diversions during demobilization, the consequences of plaintiff's failure to provide the additional information or to take other actions adequate to remove the confusion must be borne by plaintiff.

The COE's August 18 letter requested special consideration for loading of plaintiff's Seattle-destined equipment because of contractual commitments in Seattle. Separation of the Seattle-bound equipment, which was sought by plaintiff, from the Adak- and Seward-bound equipment, warrants the different treatment by AEC and H & N for the two categories when the September 13 barge was loading. A copy of the August 18 letter was sent to plaintiff's Seattle office.

The AEC memorandum of August 27, which also was sent to plaintiff's Seattle office, notified H & N in Amchitka that plaintiff was responsible "for all additional costs incurred" for the equipment that was not returned to Seattle. In the circumstances, it was incumbent on plaintiff to do more to clarify its arrangements with the COE if it wanted the Adak and Seward equipment loaded on the September 13, 1969, barge.

Plaintiff, however, made no special effort between September 1 and September 13 to have the Adak and Seward equipment loaded. The COE's request on the Seattle-bound equipment was not clarified. Plaintiff's Amchitka personnel did not take steps to assure H & N's Amchitka personnel's loading of the Adak and Seward equipment. Plaintiff was experienced in barge transportation and scheduling and had personnel on site. More effort was needed to accomplish arrangements that were departures from those provided by the contract.

At trial, defendant's AEC witness testified the AEC did not know that the COE contracting officer's representative had agreed plaintiff could arrange to pay Foss directly for off-course diversions. Plaintiff knew that the only function of the COE, in the overall program, was to make requests to H & N, the AEC contractor responsible for scheduling transportation, and that H & N would not act on informal requests from plaintiff. Plaintiff, in the circumstances, had the obligation to either formally amend its contract with the COE, or to secure some formal expression of its special arrangements with the COE that would serve as a basis to impute such knowledge to the AEC.

Failure to load plaintiff's Adak and Seward equipment on the September 13, 1969, barge was a reasonable result of the existing record and of plaintiff's failure to take additional action. Since all of plaintiff's equipment designated in the August 13 and 14 letters for shipment to Seattle was shipped within the 30-day contract requirement, no breach of contract occurred from the September 13, 1969, shipment.

■ In late September, evacuation from Amchitka Island of all nonessential personnel began in preparation for the underground nuclear test on October 2, 1969. After the detonation, a period was required to determine that the island and the facilities were safe from radiation, and, as a consequence, there was no barge transportation in October 1969. No breach of contract can be based on a failure to load and return in October plaintiff's remaining Adak and Seward equipment.

When normal activities were resumed, following the test, southbound traffic increased substantially because considerable amounts of equipment and scientific apparatus had to be retrograded. The barges returning to Seattle were fully laden. To accommodate the demand for space, two empty barges were sent from Seattle—one on October 15 and the second on November 15, 1969—to retrograde equipment.

■ The November 23 barge from Amchitka was fully laden. It carried scientific equipment which had been utilized to monitor the tests and which was needed elsewhere. Much of this equipment was carried in sealed vans and was of a top secret nature. Had it been diverted to other ports, additional personnel and security procedures would have been required. In addition, this barge held the Parr Company drilling rigs, subject to expensive rentals, and a large number of cement trucks.

None of plaintiff's equipment was loaded on the November barge. It would not have been reasonable, in the circumstances, to load this barge with plaintiff's low priority equipment, remove higher priority equipment, and divert it to other ports for plaintiff's convenience. Defendant's refusal to use the November 23 barge to return plaintiff's equipment was reasonable and does not constitute a breach of plaintiff's contract with the COE.

Plaintiff's remaining equipment was removed in December on the second barge specifically sent to retrograde equipment. At that time, there remained on Amchitka, in addition to plaintiff's equipment, equipment of other contractors destined for Seattle and equipment that belonged to Chris Berg. Defendant was contractually obligated to return the Chris Berg equipment to Seward.

In order to assure removal of all equipment remaining on Amchitka with one barge, a special round trip was made from December 9 through December 12 from Amchitka to Adak to return plaintiff's Adak-designated equipment. On this trip, plaintiff's Adak equipment was the only cargo on board. Plaintiff did not request this special round trip to Adak for its equipment, and the December 4, 1969, letter from H & N to Foss relative to diversion into Adak to accommodate the COE contractors, shows that the special round trip to Adak was for the convenience of defendant.

■ Defendant has counterclaimed for the full cost, $4,178.50, of the round trip to Adak. Had the barge been diverted off course into Adak, in accordance with plain-

tiff's request and defendant's original plan, the cost would have been approximately $1,849.50. Inasmuch as the round trip was for defendant's benefit and convenience, plaintiff only is chargeable with the costs that would apply to a diversion into Adak.

Upon its return to Adak, the barge was loaded with plaintiff's equipment bound for Seward and Seattle, Chris Berg's equipment consigned to Seward, and other contractors' equipment bound to Seattle. The barge departed Amchitka on December 16, 1969. About five lifts of plaintiff's equipment was unloaded at Seward and the majority, at plaintiff's request, was returned to Seattle. Defendant paid the entire cost, $12,007.75, of the off-course diversion into Seward. Defendant does not seek from plaintiff any counterclaim for a pro rata share of the costs for the off course into Seward.

In summary, defendant scheduled and loaded on September 13, 1969, within the 30-day provision of the contract, all of the equipment plaintiff originally had designated for return to Seattle. Had plaintiff not sought arrangements special under the contract, all of plaintiff's equipment could have been loaded and returned to Seattle at that time. Defendant's delay in removing the balance of plaintiff's equipment from Amchitka until December is reasonable on the facts of this case. Plaintiff knew the function of the COE in the AEC test program and the COE had no obligation to secure a special barge, apart from the activities of H & N, to demobilize plaintiff's equipment to Adak and Seward. Departures from the literal terms of the contract, manifest only by informal arrangements based on personal relationships, are not reasonable in a project as complex as the Amchitka test program and are not the basis for breach of contract damages. Plaintiff was experienced and should have protected its interests by formal amendment to the contract or, at least, by contemporaneous correspondence with the COE that made clear what the parties intended with respect to off-course diversions on demobilization.

## CONCLUSION OF LAW

Upon the trial judge's findings of fact and the foregoing opinion, which are adopted by the court, the court concludes as a matter of law that plaintiff is not entitled to recover and that the defendant is entitled to recover $1,849.50 on its counterclaim. Judgment is entered for defendant in that amount and the petition is dismissed.